```
              UNITED STATES DISTRICT COURT
                DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
                              )    CRIMINAL ACTION
     v.                       )
                              )    NO. 04-10299-18-PBS
PHILLIP ASARO                 )
                              )
                              )
```

### UNITED STATES' OPPOSITION TO DEFENDANT ASARO'S MOTION TO SUPPRESS EVIDENCE

The United States respectfully submits that defendant's motion to suppress evidence should be denied.  First, there was a substantial basis with the four-corners of the search warrant to establish probable cause.  Second, contrary to defendant's assertions, the search warrant was not executed until after it was authorized.

### I. Relevant Factual Summary

A.   The Affidavit in Support of Probable Cause

On May 1, 2004, at 3:59 p.m., Chief U.S. Magistrate Swartwood approved a criminal complaint and a series of search warrants.  In support of probable cause for the complaint and the search warrants, the government presented the a 165-page affidavit of DEA Special Agent Jean Drouin which described the progress of the year long investigation which involved wiretaps over twenty-one separate cellular phones, a series of multi-kilogram seizures of cocaine and cocaine transactions.

One of the defendants named in the criminal complaint was defendant PHILLIP ASARO.  The affidavit described a series of

intercepted phone calls, continuing until March 2004, in which ASARO and co-defendant MANUEL GERMOSEN (referred to as Kelvin Madera in the affidavit), a supplier of cocaine, negotiated for the sale of kilogram quantities of cocaine from GERMOSEN to ASARO.

In affidavit, at paragraphs 155 through 158, the affidavit described a series of intercepted calls during which defendant ASARO and co-defendant MANUEL GERMOSEN (Madera) arranged for GERMOSEN to deliver a kilogram of cocaine to ASARO.  In a later intercepted call, ASARO told GERMOSEN about the progress he had been making in collecting money for the drug debt he owed to GERMOSEN.  The following is a verbatim recitation of these paragraphs:

> **31.   February 8-12, 2004: MADERA, ASARO, and 56 Hurd Street, Malden, MA**
>
> 155. On February 8, 2004, at approximately 11:55 p.m., MADERA and ASARO spoke.  ASARO asked MADERA for a kilogram of cocaine ("can you get me 1") and promised to pay MADERA in 3 days ("I'll take care of you in 3 days.") MADERA said that he could not sell ASARO any more drugs until ASARO's preexisting debt to MADERA was satisfied.  After ASARO explained that one of his customers was going to pay him "20" ($20,000), MADERA reconsidered and agreed to sell ASARO his kilogram of cocaine "the same day" that ASARO was able to satisfy his debt to MADERA.
>
> 156. On February 11, 2004, at approximately 6:31 p.m., ASARO called to ask MADERA if he could *still* sell ASARO the kilogram of cocaine they had discussed on February 8 or whether ASARO would have to look elsewhere. ("Am I going to see you or you want me to call my other friend to see if he can help me.") "Phil," said MADERA, "if you want to call the other friend (about drugs)...but I need the money for the other guy." (Referring to ASARO's preexisting debt to MADERA.)  ASARO asked

again, "..can you help me or not." MADERA replied, "Yeah, I can help you...I don't know, I have to check it." Perplexed, ASARO replied, "I thought you said...I told you that I was..." "Phil, Phil," explained MADERA, "you don't understand...you have to call when you're there, you can't, you can't, you don't hold it (money) for 2 or 3 days." (MADERA was angry at ASARO for holding money he owed MADERA and not paying until MADERA could get him the kilogram of cocaine.) ASARO said he understood but pressed for the drugs anyway. MADERA replied that he had the kilogram but had to check with "the guy" first (ROSALES). ASARO said, "alright you want to come over to my house then?" MADERA said, "yeah...okay I'll be there..I'm gonna be there like at 10:00." ASARO told MADERA to "call me back when you get around (my house)." "Okay," said MADERA.

157. At approximately 10:20 p.m., ASARO told MADERA that he had the "20" ($20,000) to give MADERA as soon as he was ready, and expected another "10" ($10,000) tomorrow, and that MADERA could have it whenever he wanted. (Referring to some of the drug money ASARO owed MADERA.) ASARO asked if MADERA was "ready" for him. (In other words, if ASARO paid MADERA the "20", was MADERA ready with the kilogram.) MADERA said that he would see ASARO in the morning at around "10...11 o'clock." Before hanging up ASARO told MADERA that "everyone is starting to pay me little by little right now...I've got 20, I've got 20, I've got ten tomorrow...so before you know it, it'll be ...all ready." On February 12, 2004, at 10:59 a.m., ASARO called MADERA to see where he was. MADERA said that he would see ASARO "like in one hour." At approximately 12:09 p.m. ASARO called MADERA to find out how long he would be. MADERA said he'd be there in "2 minutes."

**Surveillance of MADERA, GERMOSEN, and 56 Hurd Street**
    158. On February 12, 2004 at approximately 12:22 p.m., surveillance at 56 Hurd Street, Malden, MA observed Christian GERMOSEN (driving) and MADERA (passenger) drive onto Hurd Street in Malden, MA and up to the residence at 56 Hurd Street in a red Chevrolet Malibu sedan (MA Reg. 4607XC); a vehicle registered to Maria Pena, 45 Estes Street, Everett, MA. [footnote omitted]. Although surveillance did not actually see GERMOSEN and MADERA enter ASARO's residence, every indication was that GERMOSEN and MADERA met with ASARO at his house to deliver a kilogram of cocaine.

In addition, at paragraph 45, the affidavit also described an intercepted call on March 10, 2004 during which ASARO told GERMOSEN (Madera) that he was still in the process collecting money from his own drug customers in order pay GERMOSEN for a past drug debt:

> \*\*\*
>
> **6)** During an intercept between ASARO and MADERA on March 10, 2004, ASARO told MADERA that he was still trying to collect money from own customers in order to pay MADERA for a past drug debt; **and 7)** on April 6, 2004, I believe that ASARO continued to reside at 56 Hurd Street, Malden, MA based upon surveillance by TFA James Picardi that confirmed ASARO's black Chevrolet Avalanche SUV (MA Reg. K40456) parked in the driveway of 56 Hurd Street.

Finally, in addition to the particular information about ASARO, the affidavit also described the drug trafficking activities of MANUEL GERMOSEN and his partners VALENTIN MARTINEZ, JOSE ROSALES, CHRISTIAN GERMOSEN. The affidavit described a continuing series of events including seizures of drug money (¶ 124), multi-kilogram seizures of cocaine (¶141, 145) as well as a series of ongoing cocaine transactions which took place for more than a year.

B.   The Execution of the Search Warrant

The search warrant was for defendant's residence, 56 Hurd Road in Malden, was signed at 3:59 PM on May 1, 2004. Shortly thereafter, the affiant, SA Drouin informed the agents at each search warrant location that the warrants had been signed.

The execution of the warrant at defendant's residence at 56 Hurd Road began at approximately 4:30 PM, shortly after the arrest of the defendant at this residence. At time, one law

enforcement officer knocked on the door and informed ASARO that his car was involved in a hit and run and asked ASARO to step out of the residence.  This was done in order to minimize any confrontation and danger to the law enforcement agents.  After ASARO stepped outside, agents placed ASARO under arrest and clearly informed him that they had a warrant for his arrest and a search warrant for his residence.

After the execution of the warrant had begun, SA Drouin drove a copy of the warrant to 56 Hurd Road.  Task Force Agent (TFA) Steven Edwards left a copy of this search warrant in kitchen to the residence.  Among the items seized during the search warrant was a series of pay/owe sheets (drug ledgers) indicating large amounts of money and approximately $23,000 in cash.

### Argument

Defendant makes two arguments.  First, the affidavit in support of the search warrant application was insufficient to establish probable cause because the information about ASARO's drug trafficking activities was stale.  Second, the search was illegal because it began before the search warrant was authorized.  Both arguments are without merit.

A.   The Staleness Issue

The Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found at a particular place."  Illinois v. Gates, 462 U.S. 213,

238 (1983). Put differently, the application must give someone of "reasonable caution" reason to believe that evidence of a crime will be found at the place to be searched. Texas v. Brown, 460 U.S. 730, 742 (1983). The evidence presented in a search warrant must provide the magistrate judge with a "substantial basis" for the probable cause determination. Id. at 238-39; see United States v. Khounsavanh, 113 F.3d 279, 285 (1st Cir. 1997)(purchase of controlled substance observed by officer does not provide *per se* probable cause, noting "[a] *per se* rule is not appropriate in the context precious Fourth Amendment protections.").

A search warrant may be held invalid if the information in the affidavit supporting probable cause is stale. See Emery v. Holmes, 824 F.2d 143, 148-49 (1st Cir. 1987)(information stale because original warrant expired 5 months earlier and only new information was new location of automobile). For example, in United States v. Wagner, 989 F.2d 69, (2nd Cir. 1993), the defendant sold a small quantity of marijuana to confidential informant from the defendant's residence and the defendant's statement to a confidential informant that she had obtained the marijuana from a co-defendant. A warrant was obtained six weeks later which was held to be stale because there was insufficient evidence to ascribe the defendant to membership in the ongoing conspiracy. Id. at 74-75.

Defendant argues that the information in the affidavit was

stale and insufficient because it pertained to telephone calls about the collection of drug proceeds on March 10, 2004 where the warrant was executed less than two months later.  In this case, however, the evidence in the affidavit set forth abundant evidence regarding the ongoing nature of the drug conspiracy as well as defendant's ASARO's drug trafficking activity.  The intercepted calls revealed not just a single transaction, but an ongoing relationship during which GERMOSEN supplied ASARO with kilogram quantities of cocaine.  Furthermore, the March 10th calls indicated that ASARO was involved in the selling his cocaine to a number of individuals and was expecting to collect drug money from these drug customers.  See Anderson v. Maryland, 427 U.S. 463, 478 n.9 (1976)(information not stale despite 3-month gap between transactions on which warrants based and issuance of warrant because "eminently reasonable to expect that such [fraudulent real estate] records would be maintained . . . for a period of time").

In cases where the government has established that the drug conspiracy is continuous and ongoing, the weight of authority in both the First Circuit and other Circuits is contrary to defendant's argument.  See United States v. Feliz, 182 F.3d 82, 87 (1st Cir. 1999)(information 3 months old not stale because agents could reasonably have believed defendant's drug-trafficking "continuous and ongoing" after confidential informant indicated he had been purchasing drugs from defendant for 12

years); United States v. Ortiz, 143 F.3d 728, 732-33 (2d Cir. 1998)(information not stale due to continuing nature of narcotics conspiracy); United States v. Greene, 250 F.3d 471, 480 (6th Cir. 2001)(information about drug trafficking 23 months earlier not stale because activity on-going and "refreshed" by corroboration); United States v. Leasure, 319 F.3d 1092, 1099 (9th Cir. 2003)(information 6 months old not stale because referred to widespread, ongoing narcotics operation that required lengthy investigation and some information obtained only days before execution); United States v. Webb 255 F.3d 890, 905 (D.C. Cir. 2001)(information 3½ months old not stale because longtime drug dealer would reasonably retain papers permitting him to renew contact with supplier).

Furthermore, a magistrate's decision to issue a warrant must be reviewed with great deference. Ornelas v. United States, 517 U.S. 690, 696 (1996). In reviewing the affidavit supporting an application for a search warrant, reviewing courts should give significant deference to the magistrate judge's initial evaluation, reversing only if there is "substantial basis" for concluding that probable cause existed. United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005), citing United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999).

In this case, Chief Magistrate Swartwood had more than a "substantial basis" to justify the signing of the search warrant. The affidavit established the ongoing nature of the drug

conspiracy and the defendant's participation in the conspiracy by obtaining kilogram quantities of cocaine for re-sale.  In such a case, "[o]ne can reasonably infer that such regular, large-scale traffickers would need to keep detailed accounts, customer lists, and money 'in some safe yet accessible place,' i.e., their homes."  <u>Ribeiro</u>, 397 F.3d at 49, <u>quoting</u> <u>Feliz</u>, 182 F.3d at 87-88.

B.   The Execution Issue

Defendant's second argument is simply factually incorrect. The defendant under indictment claims that the police began their search at approximately 2:45 PM before the warrant was executed. His sole corroboration is his personal phone records about a series of phone calls me made before the search and before he took a nap.  Defendant's corroboration is akin to arguing that the dog ate his homework and then producing a picture of the dog.

At a hearing on the matter, the government will establish that the execution of the warrant did not begin until approximately 4:30 PM, after the search warrant was authorized.

**Conclusion**

For the foregoing reasons, defendant's motion to dismiss the indictment should be denied.

                                    Respectfully submitted,

                                    MICHAEL J. SULLIVAN
                                    United States Attorney

By:        /s/ Neil J. Gallagher, Jr.
               Neil J. Gallagher, Jr.
               Assistant U.S. Attorney
               One Courthouse Way
               Boston, MA
               (617) 748-3397

Date: January 29, 2006

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and mailed to all those not participating in ECF.

                                    /s/ Neil J. Gallagher, Jr.

                                    Neil J. Gallagher, Jr.